Good morning, your honors. May it please the court. Cindy Moodle, federal defender, is on behalf of Mr. Gonzalez-Silva. I would like to reserve two minutes of my time for rebuttal and I will keep my eye on the clock. The government had to prove alienage in this case, but because it improperly introduced the contents of a Mexican voter ID card under the guise of refreshing recollection and Mr. Gonzalez-Silva's unmirandized statements, this court should remand for a new trial. Was the card introduced or was it used simply to refresh your recollection? The card itself was not introduced, your honor, but the contents were. And so essentially, even though the actual physical card was not admitted, the magistrate judge in finding guilt did actually reference the card itself and that's in the record at 164. So the court is correct that the actual physical card wasn't admitted, but it's important to note that the court referenced the physical card itself. If the questions that were asked related to what was actually on the card and not simply for refreshing recollection, is that even if you say that's to refresh the recollection, is that refreshing the recollection or actually basing the testimony on the context of the card itself? It's basing the testimony on the contents of the card itself and we see that in the record specifically looking at the questions that were asked by the prosecutor and that's in the record at 120 to 121. The prosecutor asked the witness first, so what's the defendant's name as listed on the card? Second, did it also list a date of birth? And third, did the card you reviewed also provide a date of birth? Can you address the government's argument, which was not the basis for decision below, that handing over the card is in effect an adoptive admission of its contents? It's not an adoptive admission in this case because the record is ambiguous as to whether or not Mr. Gonzales-Silva actually handed the card to Agent Areola. What we see in the record... Tell me where it's ambiguous. Because we have to take it in the light most favorable to the government. So tell me where you think the ambiguity is and why we shouldn't resolve that in favor of the government. It's ambiguous in two ways. First, through the testimony of Agent Areola provided at the magistrate court, he specifically told the prosecutor that he did not ask Mr. Gonzales-Silva any other questions prior to obtaining the card. So that statement, no, itself, taking it on its face, is that he did not ask for a card. Now even if we consider the following statement, which was, I think I asked Mr. Gonzales-Silva for identification... Isn't it a reasonable inference that one way or the other, Mr. Gonzales handed him the card? In other words, he didn't say, I frisked him and I found the card on him. So whether he did it because he asked him or not, if he handed the card to a guy who was asking about his citizenship, why isn't that an adoptive admission? Here, you want to know about my citizenship? Here's my Mexican voter card. Had Mr. Gonzales-Silva actually handed it to Agent Areola? Whether he handed it or said, it's in my pocket, take it out or whatever. Why isn't that an adoptive admission? Because that's not what happened here, Your Honor. Mr. Gonzales-Silva, there's nothing in the record to show that Mr. Gonzales-Silva even mentioned the card, told the agent where to grab it from. What we do know from the record is that Mr. Gonzales-Silva was actually handcuffed at that point. And the ambiguity in the record is the fact that we don't know where the card was located. So let's assume for a moment that that was error. I think if the un-Mirandi statements come in, that error is harmless, is it not? No, Your Honor, it's not. And that's because the statements of Mr. Gonzales-Silva at the field were essentially admissions to alienage, which was the of the case at trial. And... Stop again. I missed your point. If those statements come in, they establish everything that was on the card, which is that I'm a citizen of a different country. So if they come... I understand your argument about why they should have been excluded, but I'm not sure I understand your argument about why they wouldn't be sufficient to establish the only thing that the card established, which was his alienage. Can you help me out? Yes, Your Honor. So both the statements and the card were admissions of alienage. So even if this court was to consider the card as an adoptive admission, at a minimum, the card itself was also an un-Mirandi statement. So there's two sets of Miranda issues. One of them, it's undisputed... I asked you, let's assume there's no problem here. Your concern about the card goes away, does it not? I mean, surely his admission that he's an alien is overwhelming evidence that he is. You're trying... I understand you're trying to exclude that, and I want you to get to that, but I just want to focus on this issue. If we find that his Miranda rights weren't violated, then isn't the introduction of the card harmless error? It's not, Your Honor, because the admission of the card, as mentioned, it is an admission to alienage, and that goes to the heart of the case. The Supreme Court in Arizona versus Fulamonte has held that a defendant's confession is probably the most probative and damaging evidence that can be admitted against him. And this court in United States versus Barnes has held that confessions that go to the heart of the case are seldom harmless. I think what Judge Hurwitz might be asking is, you really have to claims for us to be able to grant the petition for relief, correct? Yes, Your Honor. If you lose your Miranda claim, you lose this case, do you not? No, Your Honor. Well, I understand what the court is asking. Yes, that's correct. And so we believe that both of the statements, because they were on Miranda's statement, should be excluded. And so in order to win the case... I understand that you that the card is in effect and on Miranda's statement, but therefore your entire case turns on whether or not your client's Miranda rights were violated, right? Correct. Because if they weren't, then, you know, you're still stuck, right? That's right. So could you turn to that and tell me why? Yes. Here the actions of Agent Areola exceeded the scope of a Terry stop, and that's Agent Areola... the tactics that were used by Agent Areola included having Mr. Gonzalez-Silva first stop, then kneel, get on the ground laying face down, then roll over, and then he handcuffed him. This court, looking at the cases that this court has determined whether or not the officer has exceeded a Terry stop, first looking at Cervantes Flores, where the level of restraint there was also handcuffs, the court held that it was permissible because there was a threat of flight. In that case, the defendant fled from a marked Border Patrol agent and led him on a chase for about three-fourths of a mile. Similarly, in United States v. Gallegos, the level of restraint was the defendant sitting. So I will grant you that our line of cases on this issue is not basting clarity, that there are many of these cases turn on sort of slight, you know, differences in the facts. But it seems to me that the facts of this case are more consistent with the cases that you're describing than not. And specifically here, the circumstances, I think, could arguably have justified the actions taken by the Border Patrol agent. So your client was not by himself, there were multiple people, there could have been. Tell me why the Border Patrol agent was not justified in doing what he did, given the fact that you have a lot of these facts that exist in some of these other cases, including the fact that there are multiple people, it's dark outside, there's this risk of flight. The court mentioned that there was other individuals around. So the record, I see that my time's elapsed, if I can briefly respond. The record shows that 30 minutes before Mr. Gonzalez-Silva being arrested, a scope operator saw a group of individuals climbing over the fence, but that was through thermal image glowing. There's nothing in the record to link Mr. Gonzalez-Silva to those 30 people. But what we do see is that there was only one individual that Agent Areola arrested, which was Mr. Gonzalez-Silva. Agent Areola was hidden in the brush, and not until after he jumped out and told Mr. Gonzalez-Silva to stop did Mr. Gonzalez-Silva follow every single one of the commands by Agent Areola. How far away from the border was your client when he was stopped? A little bit close to a mile, Your Honor. And I thought there was testimony in the record that the agent, although he only saw your client, heard noises in the bush and therefore thought there were other people around. Is my recollection about the record correct? It's correct in the sense that he heard brush breaking. Agent Areola, though, himself was actually crouched hidden in the brush. And so he saw Mr. Gonzalez-Silva run past him, but there's nothing in the record to show that Mr. Gonzalez-Silva saw Agent Areola hidden in the brush. As soon as Mr. Gonzalez-Silva heard Agent Areola jump out of the brush and yell and tell him to stop, he did and complied. And so would you like to reserve the balance of your time and I'll add an extra, we'll give you two minutes for rebuttal. Yes, thank you. Thank you. Good morning and may it please the court. Henry Bichar for the United States. This court should affirm Mr. Gonzalez-Silva's conviction for improper attempted entry. I want to pick up where counsel left off regarding the Terry stop in this case and address a couple of key facts. Judge Desai, your honor mentioned the amount of people and the danger that was posed surrounding Agent Areola. And I want to flag that in the context of Cervantes-Flores, where handcuffing was deemed permissible, where a suspect threatens physical danger or flight. So you would agree with me that that plus factor must exist. So for example, if the Border Patrol agent did not have some other reason to handcuff or to remove the suspect to a different location, then we would have a different case. But here the Border Patrol agent testified and had a fear of other people. They had seen a group of individuals cross, you know, potentially come down the fence. And so there were these additional factors that then justified the handcuffing and then the further questioning. I agree, your honor, on both fronts, both flight and danger. And I want to address the danger point. Agent Areola testified that he waded into the brush half an hour after a group of nine had scaled the border fence, quote, expecting a group to show up, expecting at least some subset of the nine individuals to appear at this location, approximately half a mile to three of a mile north of the border. And then once Agent Areola, or excuse me, Mr. Gonzalez-Silva ran past him, he could hear brush breaking to the south behind him, testifying that he heard several people. So this could easily be a situation where Agent Areola is soon outnumbered. Did Agent Areola have probable cause to suspect that Mr. Gonzalez had committed a crime at the time that he detained him? Certainly reasonable suspicion at that moment. I understand reasonable suspicion. Nobody's contesting that. Did he have probable cause? I believe not as soon as Mr. Gonzalez-Silva passed him. He did not have probable cause. He thereafter asked the four permissible questions and the standard questions under Cabrera that this court addressed 14 months ago. And in that case, in Cabrera, there were actually five questions total. Here we have a limited temporal... The difference here, though, and the difference with Cabrera is that they handcuffed Mr. Gonzalez-Silva. And so really, shouldn't our focus here be on the fact that that additional action, which may have made this a custodial interrogation, was justified because the agent had these additional justifications? Exactly, Your Honor. On the flight front and the danger front, the flight front is clear as well because you have a suspect running past you, sprinting past you, breathing heavily, wearing heavy camouflage. And as soon as Agent Areola comes out from the brush and orders Mr. Gonzalez-Silva to stop where he is in his native language, both parties are speaking their native language, they're still 20 feet away from each other. Agent Areola is only using his flashlight to illuminate the suspect before him. He's just heard brush breaking behind him. He's got a partial moon and a flashlight to engage with the suspect. The record is clear that Mr. Gonzalez-Silva was wearing a heavy camouflage jacket. Obviously, on the danger front, there are some concerns that there'd be weapons concealed in that heavy jacket. Remind me what time of day. This was at... The encounter was at 6.10 PM, Your Honor, and the arrest was made by 6.15 PM. So this is quite limited in temporal scope. And I think that's important. Under Cabrera, under Cervantes-Flores, also under Galindo-Gallegos, ordering a suspect to lie prone on the ground 20 feet away in their native language is critical here. That's permissible under Galindo-Gallegos. Nobody contests that. I think what Judge Desai was asking, at least what I'm interested in, is why the handcuffs? If the guy is lying prone on the ground, not resisting, why... The handcuffs add something to this. Do they transform it from what we've said is plainly okay, a person by himself not resisting on the ground to custody? Why don't the handcuffs transform it to custody? You need the handcuffs, Your Honor, because we have to give our agents some discretion and some ability to assess a fluid situation. They have to be able to... What do Border Patrol agents said every time we're afraid? I mean, agents are out in sort of open terrain. The conditions that they're working are often dangerous and unpredictable. So is it enough that agents could always say, look, my job is dangerous. We confront dangerous individuals. And so therefore, every time we find somebody, we're justified in handcuffing them or putting them in the patrol vehicle and removing them to a different location. What is the line? Of course, Your Honor, it is quite a dangerous job down there, especially in these facts at bar. Given Agent Areola on a cold January night is alone, often communications are quite sparse down there. But he was carrying, right? Would he have a Glock? It's not clear from the record, Your Honor. He was clearly carrying a firearm. Unclear from the record again, that firearm was holstered. And under Medina via, even drawing that firearm, even fully restricting a suspect's liberty is permissible under this court's authority. But our cases talk about having to explicitly identify some justification, some additional thing. Like there was, you know, an active fleeing suspect or a weapon that was or something. I think what you're saying here in this case, it was the fact that there were additional people that were seen. There was a rustling in the brush. Is that enough? Because we're in the business of line drawing. That's what we have to do. We have to say, does it meet our standard of sort of an additional justification to handcuff the individual that they're interrogating? And we're trying to understand whether that has been met here or not. And if it has been met here, what is the thing that took us over the line? Of course, Your Honor. In terms of line drawing, it's really where a suspect threatens that physical danger or flight. So it is quite generous under this court's authority. You know, the facts at bar fall squarely. So the threat of flight, which I think is clearly present here, enough to ask him to lie down and handcuff? Or do you need also a threat of physical danger to do that? I mean, they may both be present here. I'm not quibbling with your argument about what justified it. I'm trying to think about Judge Desai's question about line drawing. My understanding of Cervantes Flores is that is an or, that either situation can qualify to provide handcuffs, to give these Border Patrol agents the discretion to be able to use handcuffs where a suspect threatens that physical danger, as was here, or threatens flight, as was here. And in that case, I know that the flight had already happened upon seeing the Border Patrol agent. In this case, did Gonzalo Silva flee from the Border Patrol agents when they were pursuing him? Initially, was there actually a pursuit and flight, and then he stopped? There was not, based on my read of the record. As soon as Agent Arriola emerged from the brush and commanded Mr. Gonzalo Silva to stop, I understand that Mr. Gonzalo Silva did stop. He was surrounded by brush. He's wearing heavy camouflage. He's still 20 feet away. That's a considerable distance when you solely have a flashlight to light your path before you, and you're worried about dangerousness concerns behind you. You're aware that a group of nine has scaled the border fence just half an hour prior. Of course, he's on his own out there, and so that's quite significant. Let me tell you what concerns me about... We see lots of these cases. Of course. And that's why I asked you the probable cause question before. It seems to me, in terms of efficiency and safety, the best thing to do when you see somebody and you've got reason to believe that he's just scaled the border fence is to remove him to another location, give him his Miranda warnings, and they always confess. Then we wouldn't be here with these cases. Except, my question is, could you do that? Did you have probable cause at that point sufficient to say, okay, I know enough. I can't prove it in court yet, but I know enough to have probable cause to think that you've committed a crime. We put you in the car. We'll take you to the processing station. They'll give you the Miranda warnings, and just as occurred in this case, the defendant will admit that he's not properly in the country. So I'm trying to figure out whether or not, maybe for the safety of the agents and for the sanity of the court, it might not be better just to put these guys in a car and transport them to the next place before asking the four permissible questions. What's your reaction to that? Your Honor, plainly, not every arrest that occurs at the border is a custodial arrest, is a border arrest following an improper entry over the fence. No, I understand that. My question is, if you have reasonable probable cause to believe there's been an entry other than through a port of entry, do you have probable cause at that point to arrest that person for illegal re-entry? And if you do, then I'm wondering why not, you just don't arrest them and take them to the station, give them their Miranda warnings, obtain the voluntary confession that they always give, and we'd never be in this situation. So I'm not asking, and I want to get the views of opposing counsel on this too, but it does seem to me that would be a better way to run the railroad. We're not running it. We just take the passengers you bring us. What do you think? I would note that in this record, which is relatively sparse, Agent Areola testified that there are hikers that appear in Pine Valley in this area. So it's not that every person... Okay, I understand your point. Of course, Your Honor. Let me make sure I understand your point. So I think what you're saying is, you think the approach of being able to... We've grafted the Terry stop analysis onto these cases. That's not how these issues were originally sort of considered, but we've now said, okay, we kind of use the analysis that we use in a Terry stop onto these kinds of cases at the border. And so you can, if you have reasonable suspicion, you can ask these questions, develop more information to know whether or not you're going to then take somebody into custody. I think the questions that Judge Hurwitz are asking, and I have similar questions, is, is that the right analysis to graft onto these kinds of cases? Because don't the circumstances already provide enough information to give the officer probable cause to take the individual into custody? Unlike, for example, when you're driving down the street here in Pasadena and you pull somebody over and you're not really sure whether or not you have probable cause. So then that's where the Terry stop analysis makes sense. But these are very different circumstances where you have lots of things in the environment that give you information that perhaps amount to probable cause for purposes of custody. Certainly, Your Honor. I was preparing for this and it appears that... Well, you have it, you're preparing for it because we're going to ask the questions in the next case, probably. So, and maybe I can hold off. The traffic stop, that nomer in this case feels like it does not quite apply to what happens at the border. As Your Honor noted, this court's authority is well-documented. Flores Cervantes, Galindo Gallegos... Yeah, I'm not saying we can, we can change the course of the courts with respect to the Terry stop analysis. But I'm interested in your view about whether you think it's the right analysis to graft onto these kinds of cases. I do think it's the right analysis, Your Honor, where you have the Terry stop at one end and the Miranda at the other. And placing this case along the spectrum, under a totality of the circumstances test, it's quite hard. You have to graft, as Your Honor said, onto certain facts, handcuffing or lying in wait or asking questions. Think about this question and you can answer it later or in the next case. Let's assume that Mr. Gonzalez, when asked all these questions, said nothing, gave no information. Would the agent be required to let him go because he did not have, he had not provided during the Terry stop probable cause to let him think he committed a crime? The answer to that question seems obvious to me. And therefore, what Judge Desai and I are both wondering about is whether or not this follows our case law, whether the better way to view our case law is to say, look, when you're stopped under these circumstances, the agent really has probable cause to think you've committed a crime and you're in custody. And we should give Miranda warnings at that point. You know, you might not be able to give them immediately because you've got an emergency, but before the questioning, you don't have to let him go. You apprehend him, you make him safe, and then you say, you give him that one minute of Miranda warnings, which never makes a difference, and you get the confession. So I'm wondering whether viewing this through the lens of Terry, we have to in these cases, we're not going to overrule our prior stuff, is the right way to view this stuff? I think so, Your Honor. You just have to place it in the context of this stop. While he did have reasonable suspicion to handcuff Mr. Gonzales-Silva, he is a considerable distance, probably half an hour. If Mr. Gonzales-Silva had not admitted his alienage, would he have had to let him go? I don't believe so, Your Honor. If he didn't have to let him go at that point, he couldn't detain him indefinitely in order to find out stuff. So what you're saying is, if Mr. Gonzales-Silva was well advised by able counsel before he jumped the border fence, she would have said to him, just don't say anything. And if you don't say anything, and you don't have proof of your alienage on you, let's put aside his ID card, they can't do anything to you. Because they've got to let you go at some point if they haven't developed probable cause. That just can't be the law. It troubles me. I just can't think a Border Patrol agent who sees somebody jump the fence has to let him go because he doesn't answer the four questions in the way that incriminates him. To be clear, Agent Areola did not see Mr. Gonzales-Silva jump the fence. He was dispatched to this location, arrived on vehicle. Surely it is a reasonable assumption, given all the facts. Yes, Your Honor, but it's still 6 p.m. at night. Maybe we can explore this in the next case, too. Yeah, we've taken you well over your time, but thank you for indulging our questions, counsel. Thank you very much. Ms. Murrow, we'll give you three minutes on the clock, and you're probably going to get a lot of these same questions. So if you go over your time, we'll deal with it. Thank you. I think to answer Your Honor Hurwitz's question about whether or not people should be Mirandais at the border because of the circumstances, I think the answer is yes. I agree that Mr. Gonzales-Silva should have been Mirandais. Now, I recognize that that's not the current case. Well, did they have enough evidence to keep him absent the answers to the questions? I think if the Court considers the area... I mean, this may be against the interest of some of your other clients, but I just want to... I mean, I think if we're just looking at the case of Miranda v. Terry, I think that I agree with the Court that Miranda is more appropriate here. Now, I understand that Terry is what... And you think that's because he was in custody. I understand that. Yes. Go ahead, Judge. To follow up on Judge Hurwitz's question, suppose your client had simply said, look, I don't want to talk to you. What, at that point, are the agent's options? The agent can choose to arrest him or to let him go. Arrest him for what? He was arrested. Probable cause at that point? I would argue no, and that he should let him go. Then you can't say he can choose to arrest him. You're saying if he chose to arrest him, I'd come into court and say he did it improperly because he didn't have a proper cause. Legal arrest. 1983 or... And we recognize that that's your job. Your job is to make those arguments. So, I think we're asking you sort of in a more hypothetical way that if we're not going to draft the Terry Stapp analysis onto these cases, then the alternative is when the circumstances look similar to what we have in this case, which is an individual not at a port of entry, but in sort of a remote area, close to a border fence, out wearing camouflage in the bushes. Does that rise to the sort of level of probable cause that would allow an agent to take them into custody, which would then require Miranda warnings? That's correct. That's exactly right. It would require Miranda warnings at that point if those circumstances are present. What do you say to the argument that your friend on the other side made that, and now I'm moving back into sort of what the realm of our case law already requires, which is to determine whether or not somebody is in custody for purposes of whether we're allowing for un-Mirandized questioning. Here, because they handcuffed your client, he says that there needs to be a threat of physical danger or flight, and that is the sort of plus factor that would justify the handcuffing. What do you think about that? Do you disagree with that? And if so, what's your best case for the fact that here the handcuffs weren't justified? I disagree that the handcuffs were justified, and if we look at Cervantes' floors, in that case, there was a use of handcuffs. But in that case, the defendant actually fled from Border Patrol. Here, Mr. Gonzalez Silva did not flee. But you're arguing from a negative, and it would be helpful, I think, if you could argue from a case. In other words, there was more in that case, and therefore the handcuffs were justified. But the court didn't say if there wasn't this extra fact, they wouldn't be justified. So I'm trying to find a case where the court said the handcuffs weren't justified. And to sort of add to that, I think because your friend on the other side said a threat of danger or flight, here maybe we don't have flight, but they're arguing that there's the threat of danger because there were these other individuals that were sort of seen in the area around the same time, that there is not a clear view because he's hiding in the bushes. So there's the threat of danger, if not the flight. So is that enough? It's not, Your Honor, because there was nothing in the record to show that Mr. Gonzalez Silva was actually himself armed or that he did anything dangerous towards Agent Areola. Even the dispatch call was for individuals crossing the border. That's not a violent crime. It's a status offense. And I think earlier, Your Honor, Desai asked a kind of like a policy question whether or not this would essentially become a slippery slope if all Border Patrol agents were permitted to say that their jobs were dangerous and unpredictable, and therefore every single time they would be able to place people under arrest. That's precisely the issue, and that's why Border Patrol agents shouldn't have the ability to do that, because then that means every single individual that they encounter at the border, they would be able to place in handcuffs. But before you sit down, I want to just return to a question I asked you a few minutes ago. Suppose the man just says, I choose not to talk to you. What at that point are the agent's options? If the agent feels like there's enough probable cause to arrest him, then he would place him under arrest and Mirandize him. If the circumstances demonstrate that there's probable cause and he's either able to arrest him, if there's not, then he has to let him go. So what were the circumstances in my scenario, in my hypothetical that would justify an arrest? If the individual was seen himself crossing the border, seen himself not walking through a point of entry? If the agent had actually seen him cross the border, we would have a different case. In this case? The fact that it's so close to the border, the fact that he had received a dispatch call about individuals crossing the border, even though Mr. Gonzales' level was not directly seen within the image. Does those factors give him any basis for connecting what was seen on the camera to this individual? Right. And so then he would have to let Mr. Gonzales' level go. So let me use Judge Parker's hypothetical with the exact facts of this case. The only fact that is that when questioned, your client says nothing, or I refuse to talk, but provides no information. Your position is that the Border Patrol agent has to let him go at that point? That's correct. Okay. Thank you. Thank you very much. Thank you all both. Very interesting argument. Okay. Next, we'll hear United States v. Kumar, and then we'll take a short break after this case in between.
judges: Parker, HURWITZ, DESAI